**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 24 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BEVERLY HACEESA, individually,
and FIRST FINANCIAL TRUST
COMPANY, as Conservator for
SHENOEL HACEESA, a minor,

    Plaintiffs - Appellees,

v.

UNITED STATES OF AMERICA,

    Defendant - Appellant.

No. 01-2252

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-99-0060 MV/RLP)**

---

William G. Cole, Attorney, Appellate Staff, Civil Division, Department of Justice,
Washington, D.C. (Robert S. Greenspan, Attorney, Appellate Staff, Civil
Division, Department of Justice, Washington, D.C., Robert D. McCallum, Jr.,
Assistant Attorney General, and David C. Iglesias, United States Attorney, with
him on the briefs), for Defendant-Appellant.

James P. Lyle, Law Offices of James P. Lyle, P.C., Albuquerque, New Mexico
(Turner W. Branch, Branch Law Firm, Albuquerque, New Mexico, with him on
the brief), for Plaintiffs-Appellees.

---

Before **EBEL**, **McKAY** and **BRISCOE**, Circuit Judges.

---

**EBEL**, Circuit Judge.

On the evening of Saturday, April 25, 1998, twenty-five year-old Hardy Haceesa walked into a hospital emergency room complaining of a fever, difficult and painful breathing, chest discomfort, and general achiness. He told the nurse he thought his condition could be the result of exposure to mice. Haceesa was sent home that night, diagnosed with bronchitis and told to check back at the local clinic on Monday. By Tuesday evening, he was dead.

Only after his death was Haceesa's disease diagnosed correctly: he died of hantavirus pulmonary syndrome, a rare, deadly disease caused by exposure to airborne particles of the urine of infected mice and characterized in its early stages by flu-like symptoms. Haceesa was a Navajo Indian, and the hospital where he was first seen on April 25 – the Northern New Mexico Navajo Hospital in Shiprock, New Mexico – is owned and operated by the Indian Health Service, an agency of the United States Department of Health and Human Services. As the district court observed, Shiprock Hospital stands "in the geographic center of the world for" hantavirus.

The present suit was brought by Haceesa's widow Beverly Haceesa and his four year-old daughter Shenoel, alleging medical malpractice in the failure to diagnose Haceesa's hantavirus. The suit was brought against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 et seq. After a bench trial in federal district court for the District of New Mexico, the

court found the Government liable and awarded the Plaintiffs damages of over

$2.1 million.[1]  On appeal, the Government no longer disputes its liability, but

challenges the damages awarded on three distinct grounds.  First, it argues that

New Mexico's $600,000 statutory cap on medical malpractice recoveries applies

to the Plaintiffs' suit.  Second, the Government argues that its liability should be

reduced to reflect its comparative negligence relative to a subsequent health care

provider that also failed to diagnose Haceesa's hantavirus.  Third, it argues that

certain of the Plaintiffs' claims are barred because they were not administratively

exhausted at the time suit was filed.  The district court rejected all three

arguments.  We conclude that the district court erred (1) in concluding that the

recovery cap did not apply; (2) in failing to calculate the Government's liability

on the basis of New Mexico's "loss of chance" approach; and (3) in concluding

---

[1]  The district court found that the Plaintiffs' total damages were approximately $3.3 million.  Finding as fact that the Government's negligence resulted in the loss of a 65 percent chance that Haceesa would survive, the court awarded damages in the amount of 65 percent of approximately $3.3 million or approximately $2.15 million (citing Alberts v. Schultz, 975 P.2d 1279 (N.M. 1999)).

On appeal, the Plaintiffs do not challenge the district court's decision to reduce the judgment to 65 percent of their damages.  Additionally, the Government did not argue below, and specifically disclaimed at oral argument an intention of arguing here, that the damages awarded should have been offset by the amount of a settlement between the Plaintiffs and another hospital that also failed properly to diagnose Haceesa's condition.

that the Estate's claim for wrongful death was timely filed. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

## I. APPLICATION OF THE FTCA TO NEW MEXICO'S CAP ON MEDICAL MALPRACTICE RECOVERIES

The district court awarded the Plaintiffs over $2.1 million in damages. The Government argues on appeal that this damages award should have been subject to New Mexico's $600,000 cap on medical malpractice recoveries. N.M. Stat. § 41-5-6(A) ("the recovery cap"). The district court rejected this argument:

> The New Mexico cap on damages under the New Mexico Medical Malpractice Act does not apply in this case. The cap only applies to negligence by a "health care provider," which is defined as a "person, corporation, organization, facility or institution licensed or certified by this state to provide health care or professional services as a doctor of medicine, hospital, outpatient health care facility, doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist or physician's assistant." NMSA § 41-5-3(A). Plaintiffs' claims against the hospital administrators who elected to provide absolutely no training to Nurse Rhodes, as well as their claims of negligence against Nurse Rhodes, are not capped under the statute.

In other words, the district court concluded that (1) the recovery cap applies only to suits against health care providers, and (2) that Haceesa's suit against hospital administrators and a nurse was not a suit against health care providers. On appeal, the Government challenges each of these conclusions. The Plaintiffs, meanwhile, argue for affirmance on the alternative ground that, under New

- 4 -

Mexico law, the Government is not entitled to the benefit of the recovery cap. After summarizing the relevant law, we address each of these three arguments below.[2]

Under the FTCA, the United States is liable for its tortious conduct in the same manner and to the same extent as a private individual under like circumstances in that jurisdiction would be liable. 28 U.S.C. §§ 1346(b), 2674. Here, our charge is to determine first the scope and applicability of the limits New Mexico statutes impose on the medical malpractice liability of private entities.

New Mexico's recovery cap provides: "Except for punitive damages and medical care and related benefits, the aggregate dollar amount recoverable by all persons for or arising from any injury or death to a patient as a result of malpractice shall not exceed six hundred thousand dollars ($600,000) per occurrence." N.M. Stat. § 41-5-6(A). "A health care provider's personal liability is limited to two hundred thousand dollars ($200,000) for monetary damages and

---

[2] The Government did not argue below, and conceded at oral argument that it does not argue here, that Government liability for the actions of the hospital administrators in failing to train hospital employees or implement appropriate patient assessment protocols is barred by 28 U.S.C. § 2680(a) (stating that FTCA waiver of immunity "shall not apply to – (a) Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.").

medical care and related benefits . . . .  Any amount due from a judgment or settlement in excess of two hundred thousand dollars . . . shall be paid from the patient's compensation fund . . . ."  Id. § 41-5-1(D).  As the district court noted, the statute defines "health care provider" as a "person, corporation, organization, facility or institution licensed or certified by this state to provide health care or professional services as a doctor of medicine, hospital, outpatient health care facility, doctor of osteopathy, chiropractor, podiatrist, nurse anesthetist or physician's assistant."  N.M. Stat. § 41-5-3(A).  "'[M]alpractice claim' includes any cause of action arising in this state against a health care provider for medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care . . . ."  Id. § 41-5-3(C).

Not all "health care providers," however, are entitled to the benefit of the recovery cap: "A health care provider not qualifying under this section shall not have the benefit of any of the provisions of the Medical Malpractice Act in the event of a malpractice claim against it."  Id. § 41-5-5(C).  In order to be "qualified," a health care provider must "(1) establish its financial responsibility by filing proof . . . of malpractice liability insurance . . . of at least two hundred thousand dollars . . .; and (2) pay the [Patient's Compensation Fund] surcharge."  Id. § 41-5-5(A).

A. <u>Whether the recovery cap applies to a suit against the Government</u>

The Plaintiffs argue that we need not reach the question of whether the district court's rationale for refusing to apply the recovery cap is correct, because the Government is not "qualified" within the meaning of the Medical Malpractice Act and therefore ineligible to benefit from the recovery cap. The Government does not dispute that it has not filed proof of liability insurance and has not paid any surcharge into the Patients' Compensation Fund, and thus, by the terms of section 41-5-5, is not "qualified."

Three circuits have considered arguments similar to that now offered by the Plaintiffs, and all three circuits have held that the Government was entitled to the recovery cap despite failure to file proof of financial responsibility and to contribute to a compensation fund. <u>See</u> <u>Carter v. United States</u>, 982 F.2d 1141, 1143-44 (7th Cir. 1992); <u>Lozada v. United States</u>, 974 F.2d 986, 987 (8th Cir. 1992); <u>Owen v. United States</u>, 935 F.2d 734, 737-38 (5th Cir. 1991). The rationale supporting these holdings is that (1) the FTCA refers to like circumstances rather than identical circumstances,[3] (2) the financial responsibility

---

[3] This reasoning is consistent with Tenth Circuit case law. <u>See</u> <u>Nationwide Mut. Ins. Co. v. United States</u>, 3 F.3d 1392, 1396 (10th Cir. 1993) ("Recognizing that the United States is seldom situated identically to private parties, however, the 'like circumstances' inquiry requires only that the United States be analogized to a similarly situated private party. Nice pieces of casuistry and hypersensitive legalisms are to be avoided in interpreting this language." (internal quotation

(continued...)

of the United States is assured, and (3) its failure to contribute to a compensation fund is immaterial because (unlike qualified providers) it must pay its liabilities without resort to the compensation fund.[4]  This court has endorsed these holdings. Hill v. United States, 81 F.3d 118, 121 (10th Cir. 1996) (citing, inter alia, Carter, Lozada, and Owen, and stating, "These cases stand for the proposition that where there is a specific cap on tort liability, the United States government may benefit from this limit although it did not otherwise participate in the statutory scheme which provides the cap. . . ."[5]

_____

[3](...continued)
marks and alterations omitted, citations to Carter and others omitted)).

[4]  Here we hold that the Government's liability is subject only to the $600,000 cap and not to the individual $200,000 cap because the lower individual cap assumes that the amount of damages in excess of $200,000 would be paid by the compensation fund.  The Government did not pay into the compensation fund and hence cannot look to it to help pay the damage award.

[5]  Haceesa urges that Hill supports rather than undercuts his position by highlighting its statement that "None of these cases [Carter, etc.] offers direct support for the proposition that the United States may attempt to create a rough equivalent to a state statute when they clearly are ineligible for the precise remedy provided therein."  81 F.3d at 121.  Hill drew a distinction between state statutes such as those in Carter, Lozada, and Owen "where there is a specific cap on tort liability" with the situation where the United States was ineligible for a particular remedy yet urged a court "to fashion a remedy that will further the intent and approximate the outcome of a statute."  Id. at 120-21.  The quoted language relied upon by Haceesa does not support her position, because the statutory remedy at issue here is substantially identical to the "specific cap on tort liability" that Hill regarded the United States as "undoubtedly" eligible for.  Id.

The Plaintiffs endeavor to distinguish <u>Carter</u>, <u>Lozada</u>, and <u>Owen</u> by arguing that New Mexico law "require[s] the United States to attend a Medical Review Panel hearing" and "grants plaintiffs the benefit of having a physician selected to assist them in continuing to pursue their claims if they are found to have merit." In essence, Haceesa's theory (offered without supporting authority) is that participation in the medical review commission procedures amounts to a qualification for purposes of section 41-5-5, and that New Mexico's qualification procedure thus is materially different from those at issue in <u>Carter</u>, <u>Lozada</u>, and <u>Owen</u>. We disagree. The Medical Malpractice Act establishes two actions that a health care provider "shall" perform "[t]o be qualified": filing proof of insurance and payment of a compensation fund surcharge. N.M. Stat. § 41-5-5. The absence from section 41-5-5 of any requirement of participation in the commission procedures demonstrates the error in the Plaintiffs' argument. In any event, we note the Plaintiffs are mistaken that health care providers are obligated to attend panel hearings. <u>Id.</u> § 41-5-19(A) (providers and their attorneys "may" attend).

The Plaintiffs next argue that "private individual[s] under like circumstances," 28 U.S.C. § 2674, generally have not availed themselves of New Mexico's qualification procedures, and thus the Government should not be regarded as having done so. (Aple B. 18 ("A review of reported New Mexico

cases indicates that most cases brought against negligent hospitals are outside the NMMMA." (citations omitted)).) By contrast, in <u>Carter</u>, the Seventh Circuit noted that "[a]ccording to the record, more than 90% of the private medical providers" had satisfied analogous qualification procedures. 982 F.2d at 1143. It is not apparent to us why the United States should be precluded from taking advantage of a state liability cap just because a substantial majority of private medical providers voluntarily chose not to qualify as a qualified health care provider. In any event, the record before us is totally inadequate even to establish Plaintiff's factual premise. Accordingly, this argument fails.

Finding persuasive the holdings of all of the other circuits to address this issue, we conclude that the Government is not ineligible to invoke the recovery cap merely because it did not satisfy the relevant state qualification procedures. Therefore, we reject Haceesa's proposed alternative grounds for affirmance, and we turn to the grounds actually relied upon by the district court for concluding that the recovery cap did not apply.

B. <u>Whether the $600,000 recovery cap applies only to health care providers</u>.

As noted above, the definition of health care provider does not include nurses (except for nurse anesthetists, which the nurse here undisputedly was not) or hospital administrators. On this basis, the district court concluded that the

recovery cap did not apply in the present case.  The Government argues, however, that the $600,000 cap is not limited to actions against "health care providers," but instead applies to all malpractice defendants.  By its terms, the Government argues, section 41-5-6(A) limits how much "all persons" may recover "for or arising from any injury or death to a patient as a result of malpractice."  Only section 41-5-6(D)'s $200,000 cap on personal liability refers expressly to "health care providers."  The New Mexico courts have not ruled on whether the recovery cap applies to all malpractice actions or only those brought against health care providers, so we must predict how they would resolve the issue.

The Government's argument assumes that the phrase "amount . . . for or arising from any injury or death to a patient as a result of malpractice, " § 41-5-6(A), has a meaning distinct from "malpractice claim," which is defined in relevant part by the Act to "include[] any cause of action . . . against a health care provider for . . . lack of medical treatment."  N.M. Stat. § 41-5-3(C) (emphasis added).  We need not decide this question because of our conclusion in the next section that the United States is a qualified health care provider for purposes of this suit.

C. <u>Whether the Government is a health care provider for purposes of this suit</u>.

Ultimately, whether the recovery cap applies to the Plaintiffs' present suit turns on whether this FTCA suit against the United States, arising from the actions of a nurse and health care administrators, is a suit against a "health care provider" within the meaning of the recovery cap statute. To answer this question, we begin with the text of the statutory provisions governing FTCA liability. Under 28 U.S.C. § 1346(b), "the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States . . . for injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable." Under 28 U.S.C. § 2674, "the United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances." Finally, as already noted, New Mexico's statutory recovery cap applies only to suits against "health care providers," a term that includes hospitals but does not include either nurses or hospital administrators.

The issue before us is one of statutory interpretation. If "private person," § 1346(b), and "private individual," § 2674, includes employers, then the recovery cap applies here because the private employer analogous to a government hospital is a private hospital. Section 1346(b) unmistakably is couched in the language of

an employer's respondeat superior liability, creating jurisdiction over actions "against the United States . . . for injury . . . caused by the . . . wrongful act . . . of any employee . . . while acting within the scope of his office or employment." § 1346(b). <u>See, e.g.</u>, Restatement (Second), Agency § 219(1) ("A master is subject to liability for the torts of his servants committed while acting in the scope of their employment.") Further, § 1346(b) refers to "circumstances where <u>the United States, if a private person</u>, would be liable." Because in reality the United States is not an individual employee but only an employer, this phrasing suggests that the only shoes that the Government stands in under the FTCA are those of private employers.

We think the text of the FTCA best supports the Government's employer interpretation, a conclusion buttressed by our rule that any waiver of sovereign immunity "'must be construed strictly in favor of the sovereign and not enlarged beyond what its language requires.'" <u>United Tribe of Shawnee Indians v. United States</u>, 253 F.3d 543, 547 (10th Cir. 2001) (quoting <u>United States v. Nordic Village, Inc.</u>, 503 U.S. 30, 34 (1991)) (internal quotation marks and alteration omitted).

To the extent that this issue is not resolved by the text of the statute, we look to legislative intent, and we conclude that Congress has spoken to this question. In enacting the Federal Employees Liability Reform and Tort

Compensation Act of 1988, Congress found that "[t]he United States, through the Federal Tort Claims Act, is responsible to injured persons for the common law torts of its employees in the same manner in which the common law historically has recognized the responsibility of an employer for torts committed by its employees within the scope of their employment." § 2(b), 102 Stat. 4564, 28 U.S.C. § 2671 note. Cf. H.R. Rep. 100-700 at 5 (1988), reprinted in 1988 U.S.C.C.A.N. 5945, 5949 (describing government's FTCA liability as "vicarious").

Accordingly, we conclude that the Government's liability under the FTCA is limited to that of a private employer under like circumstances. Our conclusion is consistent with that of at least two other circuits. See St. John v. United States, 240 F.3d 671, 676 (8th Cir. 2001) ("The FTCA is a limited waiver of sovereign immunity, allowing the federal government to be sued for the actions of 'any employee of the Government while acting within the scope of his office or employment' under circumstances where the United States would be liable if it were a private employer. 28 U.S.C. § 1346(b) and 2674."); Johnson v. Sawyer, 47 F.3d 716, 730 (5th Cir. 1995) ("All FTCA liability is respondeat superior liability. . . . Under the FTCA, the United States is not liable if the private employer would not be liable pursuant to local law."); see also Bryant v. United States, 126 F. Supp. 2d 1227, 1234 (2000); cf. Gutierrez de Martinez v.

- 14 -

Lamagno, 515 U.S. 417, 420 (1995) ("Generally, [FTCA] cases unfold much as cases do against other employers who concede respondeat superior liability."). The only circuit to reach a contrary conclusion did so in a split decision. Knowles v. United States, 91 F.3d 1147, 1150 (8th Cir. 1996) (2-1 decision). The issue in Knowles was similar to the one that we face, namely whether an FTCA suit against the United States arising from the alleged malpractice of medical specialists employed by the government was subject to South Dakota's $1 million cap on medical malpractice damages. The Knowles majority concluded that the recovery cap did not apply, reasoning as follows:

> Under the FTCA, the United States will be held liable to the same extent as a private party. It is standing in the shoes of the medical service specialists. Therefore, the United States shares in the protection of the statute to the same extent the individuals would if they were sued directly. It follows, then, that if medical services specialists, individually, are not protected by the statute, neither is the United States shielded from the consequences of their negligence.

91 F.3d at 1150 (internal quotation marks and alterations omitted). In dissent, Judge Beam reasoned that "the 'hypothetical private party' is analogous to a private employer," Id. at 1153, and "[t]he government cannot stand in the shoes of a negligent federal employee, individually, because the employee is immune from suit." Id. at 1154. Ultimately, the dissent concluded that the government has waived immunity and hence "is liable only under a statutorily-imposed respondeat superior theory." Id.

- 15 -

We find the <u>Knowles</u> dissent more persuasive.  The panel majority made no effort to come to grips with the language of § 1346(b), which, as noted above, supports the view that FTCA constitutes respondeat superior liability.  Nor did it acknowledge Congress's statement of intent in the note to § 2671.  Finally, the majority did not purport to construe strictly Congress's FTCA waiver of sovereign immunity.

D.  <u>Conclusion</u>

For the foregoing reasons, we conclude that the district court's ruling that New Mexico's $600,000 recovery cap is inapplicable to the present suit is erroneous.  We hold that, because an analogous suit against a private hospital based on the actions of employees who are not themselves health care providers would be subject to the recovery cap, the Plaintiff's present FTCA suit against the Government is also subject to the $600,000 cap.

## II.  **CONCURRENT/SUCCESSIVE TORTFEASORS**

During trial, the Government attempted to prove that physicians at San Juan Regional Medical Center (San Juan Regional), where Haceesa visited and was treated on April 27 and 28 (after his visit to Shiprock Hospital on April 25), were negligent in failing to accurately diagnose Haceesa's illness.  The Government further argued that damages should be apportioned between it and San Juan

Regional. In its post-trial decision, the district court made no factual findings regarding Haceesa's treatment at San Juan Regional, nor did it reach any conclusions regarding San Juan Regional's alleged negligence. Instead, it concluded that "[u]nder New Mexico law, . . . the negligence of the [Government] [wa]s successive, and not concurrent with, any negligence of San Juan Regional Medical Center on April 27th and 28th, 1998," and that, accordingly, the Government was liable for all damages incurred by plaintiffs. Aplt. App. at 125.

On appeal, the Government contends that the district court erred in labeling it and San Juan Regional as successive rather than concurrent tortfeasors. The Government further argues that the district court should have quantified the fault of the Government relative to that of San Juan Regional and reduced the damages to be paid by the Government. For the reasons outlined below, we agree with the district court that the Government and San Juan Regional were successive tortfeasors, but we reject the district court's conclusion that the Government is responsible for all damages incurred by the plaintiffs.

Joint tortfeasor liability in New Mexico is governed by section 41-3A-1 of the New Mexico Statutes, entitled "Several liability." This provision in effect defines two distinct categories of cases. One category involves cases "[w]here a plaintiff sustains damage as the result of fault of more than one person which can be causally apportioned on the basis that distinct harms were caused to the

plaintiff." N.M. Stat. Ann. § 41-3A-1(D). As to cases in this category, each tortfeasor "is severally liable only for the distinct harm which that person proximately caused." Id. The other category involves "any cause of action to which the doctrine of comparative fault applies," id. § 41-3A-1(A), which category implicitly consists of all joint tortfeasor cases not covered by § 41-3A-1(D). As to cases in this category, each tortfeasor who establishes that the fault of another is a proximate cause of a plaintiff's injury "shall be liable only for that portion of the total [damages] . . . that is equal to the ratio of such defendant's fault to the total fault attributed to all persons." Id. § 41-3A-1(B). These two categories have come to be identified in New Mexico case law respectively as cases involving "successive" tortfeasors and those involving "concurrent" tortfeasors. See, e.g., Lujan v. Healthsouth Rehab. Corp., 902 P.2d 1025, 1028-29 (N.M. 1995) ("[Defendants] are not concurrent tortfeasors; they are successive tortfeasors by reason of divisible and causally-distinct injuries.").

In Lujan, the court listed several factors that are relevant in determining whether tortfeasors are successive or concurrent. These factors include:

> 1) the identity of time and place between the acts of alleged negligence; 2) the nature of the cause of action brought against each defendant; 3) the similarity or differences in the evidence relevant to the causes of action; 4) the nature of the duties allegedly breached by each defendant; and 5) the nature of the harm or damages caused by each defendant.

- 18 -

Id. at 1029. Although those factors have since been criticized, see Lewis v. Samson, 992 P.2d 282, 299-300 (N.M. Ct. App. 1999) (Hartz, J., concurring in part, dissenting in part), they remain valid. See Lewis v. Samson, 35 P.3d 972, 984 n.3 (N.M. 2001) (noting criticism of factors but declining to engage in further examination of distinction between concurrent and successive tortfeasors).

Although several factors perhaps could be construed either way, we conclude that the first and fifth factors strongly support the district court's conclusion that the Government and San Juan Regional were successive tortfeasors. It is uncontroverted that the acts of alleged negligence committed by Shiprock Hospital and San Juan Regional occurred days apart from one another and in different locations. In light of the fact that hantavirus is a rapidly progressing disease, and that Haceesa presented to San Juan Regional with more severe symptoms than he did when he visited Shiprock Hospital, we conclude that the alleged negligent acts of Shiprock Hospital and San Juan Regional, though similar in type (i.e., failure to properly diagnose and treat), were distinct.

More importantly, we conclude that the nature of the harm caused by each of the hospitals was different. In Alberts v. Schultz, 975 P.2d 1279 (N.M. 1999), the court recognized the loss-of-chance-of-survival theory. In describing the theory, the court noted that "[a] claim for loss of chance is predicated upon the negligent denial by a healthcare provider of the most effective therapy for a

patient's presenting medical problem," and "[t]he negligence may be found in such misconduct as an incorrect diagnosis, the application of inappropriate treatments, or the failure to timely provide the proper treatment." Id. at 1282. The court further noted that "[e]very patient has a certain probability that he or she will recover from the presenting medical problem," and "[u]nder the loss-of-chance theory, the health provider's malpractice has obliterated or reduced those odds of recovery that existed before the act of malpractice." Id. (emphasis added). The court emphasized that "the patient does not allege that the malpractice caused his or her entire injury," but rather claims "that the health care provider's negligence reduced the chance of avoiding the injury actually sustained." Id. at 1283 (emphasis added). Consistent with these statements, the court noted: "We see no reason at this time to limit lost-chance claims to those cases in which the chance of a better result has been utterly lost." Id. at 1285.

Here, the Government concedes that "Haceesa's [condition] was far more serious when he visited [San Juan Regional] on April 27 and 28, 1998," than when he first visited Shiprock Hospital on April 25, 1998. Govt. Br. at 23-24. This admission, in our view, acknowledges that Haceesa had lost a significant chance of survival between his visit to Shiprock Hospital and his subsequent visits to San Juan Regional. Stated differently, we conclude that the Government's failure to properly diagnose and treat Haceesa on April 25 reduced

- 20 -

his chance, to some degree, of recovering from his illness, and that San Juan Regional's subsequent failure to properly diagnose and treat Haceesa on April 27 and 28 further reduced his chances, thus resulting in separate and divisible injuries.[6]

The remaining question is whether the Government is responsible for all of the plaintiffs' damages, including those emanating from San Juan Regional's alleged negligent treatment. Plaintiffs assert that the Government was an "original tortfeasor"and thus liable for San Juan Regional's subsequent medical negligence. In support of their assertion, plaintiffs point to the following statement by the court in Lewis: "the original tortfeasor is jointly and severally liable for the entire harm to the plaintiff, including the original injury and any foreseeable enhancement of the injury by medical negligence." 35 P.3d at 985.

We reject plaintiffs' arguments. Lewis involved an original tortfeasor who stabbed the plaintiff, and a subsequent tortfeasor who committed medical malpractice while endeavoring to treat the injuries resulting from the original tort. In discussing the liability of the original tortfeasor, the court was careful to

---

[6] For example, assume that Haceesa had a 65% chance of survival at the time he was seen and treated at Shiprock Hospital. Further assume that when he was seen at San Juan Regional a few days later, he only had a 20% chance of survival. Under New Mexico law, the failure of Shiprock Hospital to correctly diagnose and treat Haceesa's illness resulted in a loss of chance of survival of 45%. San Juan Regional's subsequent failure to diagnose, assuming it was negligent, would have resulted in a separate loss of chance of survival of 20%.

- 21 -

emphasize that its discussion was limited to the "narrow class of cases" involving "an <u>initial injury caused by tortious conduct</u> and a subsequent enhancement of the initial injury caused by foreseeable medical negligence occurring during the course of medical <u>treatment for the initial injury</u>." <u>Id.</u> at 984 (emphasis added). Here, in contrast, Haceesa's initial injury was not caused by the Government, but rather by the hantavirus. In other words, the medical negligence allegedly committed by San Juan Regional occurred during an attempt to treat the condition caused by the hantavirus, not during an attempt somehow to treat the injury (loss of chance) caused by the Government's own medical negligence.[7] Thus, <u>Lewis</u> is distinguishable from the instant case, and the district court erred in characterizing the Government as an original tortfeasor responsible for all of plaintiffs' damages. On remand, it will be necessary for the district court to make findings of fact regarding the loss of chance of survival caused by the Government's

---

[7] This point becomes more clear if we hypothesize a third potential defendant in the present case, a party whose negligence caused Haceesa's exposure to hantavirus. Assume, for example, that his employer negligently provided an unsafe workplace by ordering Haceesa to work in conditions posing a high hantavirus infection risk. This hypothetical defendant would be an "original tortfeasor" within the ambit of <u>Lewis</u>, and would be responsible not only for injuries resulting from his own tortious conduct but also for injuries caused by the subsequent medical negligence of the Government and San Juan Regional. Removal of the hypothetical original tortfeasor from the picture does not transform the first medical provider into an original tortfeasor as those terms are used in <u>Lewis</u>.

medical negligence and the amount of damages associated exclusively with that loss of chance.

### III.  **JURISDICTION OVER CLAIMS OF THE ESTATE**

The Government contends the district court lacked jurisdiction over the claim asserted by the Estate of Haceesa (the Estate).  According to the Government, the Estate failed to file its claim in federal district court within six months of the denial of its administrative claim by the Government.  Accordingly, the Government argues, "the district court's award must be limited to claims properly filed by [Haceesa's] wife and daughter."  Aplt. Br. at 16.

In order to address the Government's arguments, it is necessary to outline, in some detail, the chain of events surrounding the filing of the Estate's administrative claim and its action in federal district court.  Following Haceesa's death, three separate administrative claims were filed with the Government (more precisely, with the Indian Health Service).  The first two claims, one by plaintiff Beverly Haceesa and the other by the conservator for Shenoel Haceesa, were filed on July 2, 1998.  The third administrative claim, by the Estate, was filed on October 26, 1998.  On January 15, 1999, prior to any formal resolution of any of the administrative claims by the Government, plaintiffs Beverly Haceesa, appearing individually, and the conservator for Shenoel Haceesa filed this FTCA

action against the Government. On April 28, 1999, the Government sent a formal notice denying all three administrative claims.[8] On December 3, 1999, plaintiffs filed a motion to amend their complaint by interlineation to (1) add Beverly Haceesa as personal representative of the Estate, and (2) to add claims for Haceesa's loss of enjoyment of life, pain and suffering, and emotional distress. On March 6, 2000, the district court granted plaintiffs' motion to amend. On April 20, 2000, plaintiffs formally filed their amended complaint.

The FTCA sets forth the following parameters for filing suit. After a tort claim against the Government accrues, a claimant has two years to present that claim in writing to the appropriate federal agency for consideration. See 28 U.S.C. § 2401. Following submission of a written claim, a federal agency generally has six months to reach a final disposition on the claim. If the federal agency denies the claim, the claimant has six months thereafter to file suit in federal court.[9] See id. If the federal agency fails "to make a final disposition of

---

[8] The caption of the letter specifically refers to all three administrative claims. Aplt. App. at 147. Plaintiffs nevertheless contend that the letter addresses only the first two administrative complaints since, in its body, it refers only "to the administrative claims which [were] filed on behalf of Beverly Haceesa and Sheldon Wright, as Conservator for Shenoel Haceesa." Id. Plaintiffs' contention in this regard is erroneous. Given the caption of the letter, it is apparent that the letter's subsequent references to claims filed on behalf of Beverly Haceesa refer to both her individual claims and her claims as representative of the Estate.

[9] A tort claim against the Government is "forever barred" if it is not filed

(continued...)

[the] claim within six months," the claimant may deem the agency's failure "a final denial of the claim" and may proceed with his or her suit under the FTCA (again within the six-month period previously noted). 28 U.S.C. § 2675(a). A district court must dismiss a claim under the FTCA if it was filed before the claim was denied by the federal agency (either expressly or implicitly). McNeil v. United States, 508 U.S. 106, 113 (1993).

Applying these principles, we conclude the Estate's claims were not filed within the requisite time parameters. As noted, the Estate filed its administrative claim with the Government on October 26, 1998. That claim was officially denied by the Government on April 28, 1999. Plaintiffs did not thereafter act within six months to either add the Estate as a party or to file a separate action on behalf of the Estate. Instead, plaintiffs filed their motion to amend the complaint to add the Estate as a party and to add the Estate's claims for relief on December 3, 1999, more than a month after the six-month time period for filing suit on behalf of the Estate had expired. Assuming that the amendments to plaintiffs' complaint related back to the date of the original complaint, see Fed. R. Civ. P. 15(c) (discussing relation back of amendments), the Estate's claims would be premature under McNeil. More specifically, the original complaint was filed on

---

[9](...continued)
within the requisite time period. 28 U.S.C. § 2401(b).

January 15, 1999, before the Estate's administrative claim was denied and fewer than six months after the Estate's administrative claim was filed.

The only way that the Estate's claims could be considered valid would be if the administrative claims filed on July 2, 1998, by Haceesa's wife and daughter were sufficient to place the Government on notice that they were seeking to assert a wrongful death claim on behalf of the Estate. If there are multiple claimants in an FTCA case, "each claimant must 'individually satisfy the jurisdictional prerequisite of filing a proper claim.'" Muth v. United States, 1 F.3d 246, 249 (4th Cir. 1993) (quoting Frantz v. United States, 791 F. Supp. 445, 447 (D. Del. 1992)). Although it appears permissible for multiple claims to be asserted on a single claim form, to be valid "the form must give 'constructive notice' sufficient to warrant [government] investigation of each claim." Frantz, 791 F. Supp. at 447-48; see Barrett v. United States, 845 F. Supp. 774, 783 (D. Kan. 1994) (holding that "plaintiff must show that it gave specific notice of the claimants and the nature of the injury as to both causes of action [asserted in complaint], or face dismissal for lack of jurisdiction"). In the circumstances here, the question is whether the administrative forms filed on July 2, 1998, gave the Government specific notice that the claimants intended to assert causes of action on their own behalf (e.g., a claim by Beverly Haceesa on her own behalf for loss of consortium) and on behalf of the Estate.

To decide this question, we first turn to New Mexico tort law. Under the New Mexico Wrongful Death Act, the personal representative of a deceased person may bring a tort action for wrongful death. N.M. Stat. Ann. § 41-2-3. Damages may be awarded in such an action for, among other things, the decedent's conscious pain and suffering and medical and related care between the date of injury and death. See generally N.M. Stat. Ann. § 41-2-1. In such an action, the finder of fact may also consider a claim by the decedent's minor child for loss of guidance and counseling. See Romero v. Byers, 872 P.2d 840, 846 (N.M. 1994); see also Otero v. City of Albuquerque, 965 P.2d 354, 357 (N.M. Ct. App. 1998) (indicating that it is unclear under New Mexico law whether a minor child may bring a separate cause of action, aside from a wrongful death action, to recover for loss of guidance and counseling). However, loss of consortium damages may not be awarded in such an action to the spouse of the decedent. See Romero, 872 P.2d at 842. Instead, the spouse of the decedent must bring a separate cause of action in his or her individual capacity to recover such damages. See id.

Turning to the administrative claims, the claim filed by Beverly Haceesa on July 2, 1998, briefly described Haceesa's visit to Shiprock Hospital and the events leading to his death. Aplt. App. at 162. When asked on the form to "STATE [the] NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH

WHICH FORMS THE BASIS OF THE CLAIM," Beverly Haceesa stated: "Mr. Haceesa died due to failure to properly diagnose and treat. Beverly Haceesa, his wife, makes a [claim] for loss of spousal support, loss of consortium, loss of love and affection, emotional distress and mental anguish." Id. Later on the same form, Beverly Haceesa indicated that she was seeking $4 million in damages for "PERSONAL INJURY." Id. Based upon these responses, we conclude that Beverly Haceesa was asserting claims only on her own behalf (e.g., a claim for loss of consortium) and was not seeking to recover on behalf of the Estate.

The remaining claim is the one submitted by the conservator of Shenoel Haceesa on July 2, 1998. Aplt. App. at 164. This claim was identical to the claim submitted by Beverly Haceesa with one exception. When asked to "STATE [the] NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH WHICH FORMS THE BASIS OF THE CLAIM," the conservator stated: "Hardy Haceesa died due to failure to properly diagnose and treat. Shenoel Haceesa, his four (4) year old daughter, lost her father and hereby makes a claim for loss of parental guidance and support; loss of his love affection, emotion distress and mental anguish." Id. In our view, these claims were focused solely on the loss suffered by Shenoel Haceesa. Although, as previously noted, New Mexico law requires such claims (loss of parental guidance) to be asserted in a wrongful death action, nothing in the claim indicates that the conservator was acting on behalf of

the Estate, or was otherwise seeking to recover damages for the damages personally incurred by Haceesa.

This conclusion is bolstered when the October 26, 1998 claim filed by the Estate is examined. Although the Estate's claim is substantially similar to the two claims filed on July 2, 1998, it differs in two important respects. First, when asked to "STATE [the] NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH WHICH FORMS THE BASIS OF THE CLAIM," the claim stated: "Hardy Haceesa died due to failure to properly diagnose and treat. The Estate of Hardy Haceesa makes a claim for loss of enjoyment of life, pain and suffering, emotional distress and mental anguish." Aplt. App. at 163. Second, when asked to state the amount of damages sought, the claim indicated the Estate was seeking $1 million for "PERSONAL INJURY" and $4 million for "WRONGFUL DEATH." Id.

In an attempt to salvage the Estate's claims, plaintiffs argue that the Government's attorneys led them to believe that the Government would not object to plaintiffs' amending their complaint to add claims on behalf of the Estate. A review of the plaintiffs' supporting evidence, however, suggests that Government counsel did nothing wrong and there is no basis for applying equitable tolling in this case. In late September 1999, a paralegal working for plaintiffs' counsel sent to Government counsel a draft copy of plaintiffs' proposed motion to amend.

Aplt. App. at 44.  On October 6, 1999, Government counsel contacted the paralegal and stated "she was not opposed to amendment of the Complaint to include the claims of the Estate, but did not believe that the Complaint could be amended by interlineation."  Id.  Obviously, at the time Government counsel agreed in principle to the complaint being amended, the six-month time period for the Estate to file suit had not expired (the Estate had until approximately October 28, 1999, to do so).

For these reasons, we conclude that the claim of the Estate was not filed within the requisite time periods set forth by the FTCA and is thus "forever barred."  28 U.S.C. § 2401(b).  On remand, the district court is directed to dismiss the Estate's claims.


## IV.  CONCLUSION

We AFFIRM the district court's finding of liability against the Government and in favor of Beverly and Shenoel Haceesa, but VACATE the district court's damage award in favor of those plaintiffs and REMAND for recalculation of damages consistent with this opinion.  We REVERSE the judgment of the district court in favor of the Estate of Hardy Haceesa and REMAND with directions to dismiss the Estate's claims.